**UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**
**(SOUTHERN DIVISION)**

REMI CHIU, et al.,

*Plaintiffs*,

v.

TEACHERS INSURANCE AND ANNUITY ASSOCIATION OF AMERICA,

*Defendant*.

Case No. 1:26-cv-01230-ABA

# REPLY IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS PLAINTIFFS' CLASS ACTION COMPLAINT

## INTRODUCTION

Defendant Teachers Insurance and Annuity Association of America ("TIAA") respectfully submits this Reply in further support of its Motion to Dismiss Plaintiffs' Class Action Complaint (ECF 41). Only two questions remain before the Court: (1) whether Plaintiffs have established Article III standing, and (2) whether the Complaint states a claim upon which relief can be granted under Rule 12(b)(6). Plaintiffs' Opposition (ECF 46) fails to overcome the grounds for dismissal on either front.

Plaintiffs' Opposition suffers from three fundamental deficiencies that pervade each of its arguments. *First*, it overreads *Doe v. Shady Grove Reprod. Sci. Ctr.*, No. 24-cv-2368-ABA, 2025 WL 2781542 (D. Md. Sept. 30, 2025) ("*Shady Grove*"), as compelling a finding of standing here, despite that case's materially different allegations involving inherently sensitive health information (fertility treatment records). Nothing in *Shady Grove*, or the Supreme Court authority it relies on, supports Plaintiffs' argument that routine financial-tool inputs are protected to the same degree or their disclosure alone establishes concrete harm. Indeed, the Opposition relies on

generalized, category-level allegations rather than plaintiff-specific facts alleging harm. Plaintiffs plead that unspecified "Confidential Information" was entered into unspecified "TIAA Systems," and then improperly aggregate one plaintiff's allegations across eight others. *Second*, the Opposition tries and fails to distinguish TIAA's cited standing authorities, attempting to draw a technologically unsupported and legally immaterial distinction based on the labeling of the tracking technology at issue rather than addressing the operative question: whether Plaintiffs allege individually identifiable disclosure of sensitive information with the specificity Article III requires. *Third*, Plaintiffs cannot reconcile their selective reliance on TIAA's Privacy Notice, invoking it to support theories of non-consent and tolling, with their simultaneous refusal to accept that same notice's express disclosures of digital tracking via pixels, beacons, and cookies, which placed them on inquiry notice and undermine the very concealment theory on which their timeliness arguments depend.

For each of these reasons, and as set forth more fully below, the Motion to Dismiss should be granted.

# I. ARGUMENT

## A. Plaintiffs Still Lack Article III Standing.

Under *TransUnion LLC v. Ramirez*, 594 U.S. 413, 425 (2021), a plaintiff invoking federal jurisdiction must demonstrate a concrete injury that bears a "close relationship" to a harm "traditionally recognized as providing a basis for lawsuits in American courts." A bare statutory violation without a showing of concrete harm does not suffice. *Id.* at 427. In the Fourth Circuit, "mere compromise of personal information, without more," fails this test. *Hutton v. Nat'l Bd. of Examiners in Optometry*, 892 F.3d 613, 621 (4th Cir. 2018); *see also O'Leary v. TrustedID*, 60 F.4th 240, 245–46 (4th Cir. 2023) (affirming dismissal of plaintiff's privacy claim where plaintiff

failed to demonstrate any injury related to alleged statutory violation). Plaintiffs' Opposition does not overcome this framework; it merely repackages its conclusory allegations under the guise of *Shady Grove*.

### 1. ***Shady Grove*** **Is Factually and Legally Distinguishable, and Its Reasoning Supports Dismissal Here.**

Plaintiffs' principal standing authority is *Shady Grove*. TIAA respectfully submits that this Court's analysis in *Shady Grove* actually illuminates why Plaintiffs' claims must fail.

First, the nature of the information is categorically different. In *Shady Grove*, the plaintiffs alleged disclosure of "personally identifiable health data," including specific medical provider names, office locations, and appointment scheduling, that revealed that identified individuals were actively pursuing infertility treatment at a reproductive clinic. *Shady Grove*, 2025 WL 2781542, at *1. This Court recognized that such information constitutes "the most sensitive information that could be collected about a person." *Id.* *5. Indeed, protected health information ("PHI") is subject to unique and heightened regulatory requirements that reflect the law's longstanding recognition that medical information warrants special protection not extended to general financial-tool inputs. *Smith v. Facebook, Inc.*, 262 F. Supp. 3d 943, 954-55 (N.D. Cal. 2017), *aff'd*, 745 F. App'x 8 (9th Cir. 2018) (holding that publicly available browsing data stands in stark contrast to the personally identifiable patient records and medical histories that federal and state privacy statutes are designed to protect). Here, by contrast, Plaintiffs allege disclosure of unspecified inputs to general-purpose financial calculators—the "Am I On Track" retirement tool and the "Debt Illustrator"—available to any visitor on TIAA's public website as an educational and informational tool. Generic debt-calculator inputs (debt type, amount owed, interest rate) are the type of numerical data that users routinely enter into the free calculators and educational content that many financial institutions' websites offer, unlike fertility records, which reveal sensitive medical and reproductive choices.

Second, this Court's analysis in *Shady Grove* turned on allegations that trackers received information sufficient to identify specific individuals seeking specific sensitive services—device identifiers and IP addresses linked to fertility treatment searches that enabled analytics companies to "match up" data to determine "what person—as opposed to an anonymous user—was seeking" those services. *Id.* at *9. The *Shady Grove* court evaluated the specific information pled for each plaintiff, finding standing based on the pairing of specific information disclosed (i.e., provider name and appointment schedule) with allegations of identifiable IP addresses and device identifiers. *Id*. Plaintiffs here attempt to gloss over their independent obligation to plead standing as to each plaintiff, and in turn, as to each statutory claim. The Complaint itself acknowledges that its allegations for all Plaintiffs are derived from Chiu's experience, alleging that his experience "is substantially the same as for all Plaintiffs." (Compl. ¶ 65.) For nine of the ten Plaintiffs (Askaryar, Southerland, Balagot, Rusow, Slater, Oberst, Parziale, Canning, and Seeherman), the Complaint identifies no data field, no specific tool, and no analytics tracker associated with any individual plaintiff. The generic references to "Confidential Information" and "TIAA Systems" do not satisfy the specificity that *Shady Grove* required. Even as to Chiu—the sole plaintiff whose allegations approach threshold specificity—the Complaint does not allege how the alleged disclosure of data fields depicted in Figures 11 and 12 caused him any concrete harm.

Third, the Opposition mischaracterizes *Shady Grove*'s doctrinal foundation. *Shady Grove* did not hold that disclosure of financial information is per se injurious; it noted that *Davis v. FEC*, 554 U.S. 724, 733 (2008), recognized disclosure of private information as a potentially cognizable injury. *Id.* at *3. But *Davis* involved a congressional candidate challenging mandatory disclosure to the government of campaign-expenditure amounts—a compelled public disclosure implicating First Amendment associational-privacy interests. *Davis*, 554 U.S. at 733, 744 ("[C]ompelled

disclosure, in itself, can seriously infringe on privacy of association and belief guaranteed by the First Amendment."). *Davis* did not hold that any private disclosure of any numerical data to any commercial actor constitutes Article III injury. Plaintiffs do not allege government compulsion, First Amendment interests, or any harm analogous to the competitive disadvantage that grounded *Davis*.

*TransUnion*, also cited in *Shady Grove*, reinforces this distinction. There the Court found alleged reputational harm from wide dissemination of credit reports containing defamatory statements labeling plaintiffs as potential terrorists was a concrete injury. *TransUnion LLC*, 594 U.S. at 432–33. Private disclosure to an analytics vendor is different in kind. Plaintiffs' expansive reading would give any user of any website with standard analytics tools—virtually every commercial website—Article III standing to sue for statutory damages. That result would contravene *TransUnion*'s admonition that "[o]nly those plaintiffs who have been *concretely harmed* by a defendant's statutory violation may sue that private defendant over that violation in federal court." *Id.* at 427.

Notably, the Opposition does not dispute that none of the nine Plaintiffs alleges data breach, misuse, unauthorized account access, identity theft, financial fraud, misuse of retirement assets, or monetary loss. In fact, Plaintiffs fail to articulate any negative consequence flowing from the alleged receipt by third parties of their inputs into financial calculators. Plaintiffs' silence on this point effectively concedes the absence of any concrete downstream harm. Their theory reduces to the bare assertion that the alleged transmission of financial-calculator inputs to analytics vendors is itself a cognizable Article III injury because it violates state law. *See* Compl. ¶¶ 107-112. Accordingly, Plaintiffs' allegations amount to statutory privacy claims untethered to any concrete or nonspeculative risk of harm. *O'Leary*, 60 F.4th at 243 ("The intangible harm of enduring a

statutory violation, standing alone, typically won't suffice under Article III—unless there's separate harm … associated with the violation.").

**2. The "Session Replay" Distinction the Opposition Draws Is Unsupported and Immaterial.**

The Opposition attempts to distinguish *Hernandez v. Noom*, No. 1:23-cv-00641-JRR, 2023 WL 8934019 (D. Md. Dec. 27, 2023), *Arndt v. GEICO*, 750 F. Supp. 3d 518 (D. Md. 2024), *Popa v. Microsoft*, 153 F.4th 784 (9th Cir. 2025), and related cases by characterizing them as involving "session replay" technology. This distinction is unsupported. The operative legal question in each case was not the label of the tracking technology, but whether plaintiffs alleged individually identifiable disclosure of sensitive information sufficient for Article III standing.

The Opposition's quotation of *Popa* is particularly revealing. Plaintiffs cite *Popa* for the proposition that "the disclosure of sensitive financial information would confer standing," (Opp. at 17) but omit the next clause: "Popa does not plausibly allege the infringement of any such privacy interest." *Popa*, 153 F.4th at 791. *Popa* found no standing because the plaintiff alleged only "pet-store preferences and her street name," not sensitive financial or medical information. *Id.* Plaintiffs' effort to transform Popa's hypothetical that "[t]o the extent Microsoft's tracking software *could* be offensive in particular circumstances (e.g., involving *sensitive* medical or financial information)" into an affirmative holding is unsupported. *Id.* (emphasis added).

**B. The Complaint Still Fails to State a Claim Under the Wiretap Statutes.**

**1. The "Contents" of Communications Are Still Not Adequately Pled.**

The Opposition contends that category-level descriptions such as "debt type," "amount owed," and "interest rate" adequately plead the statutory "contents" of an intercepted communication. They do not. These remain *generalized categories* of information, not the *actual substantive contents* of a specific communication. The Complaint does not identify which named

plaintiff entered which data field, what specific value was transmitted (e.g., the dollar amount, the interest rate figure, the creditor name), which Analytics Tracker received it, or when the particular communication was allegedly intercepted. Listing abstract data categories that a financial tool might collect is not equivalent to alleging the interception of actual communicative content. *See Hernandez*, 2023 WL 8934019, at *4-8 (finding plaintiffs' conclusory "personal information" allegations insufficient to establish standing or a protectable privacy interest without identifying specific captured data).

Moreover, the Complaint's reliance on IP addresses, device identifiers, and cookie identifiers as purported "contents" fails as a matter of law. These are mechanics of transmission, routing and identification data necessary for any internet communication to function, not the substantive content of any communication. *In re Zynga Priv. Litig.*, 750 F.3d 1098, 1108 (9th Cir. 2014) ("email and IP addresses 'constitute addressing information' and do not . . . reveal . . . the underlying contents of communication[s]"); *In re iPhone Application Litig.*, 844 F. Supp. 2d 1040, 1061 (N.D. Cal. 2012) (geolocation data did not constitute "content" susceptible to interception because such data is "generated automatically, rather than through the intent of the user," and therefore does not constitute the intended message conveyed by the communication); *In re Facebook Internet Tracking Litig.*, 140 F. Supp. 3d 922, 935 (N.D. Cal. 2015) (cookies containing only a Facebook user's unique identification information and a record of browsing history do not qualify as "content"). Plaintiffs' attempt to recharacterize these identifiers by invoking *Shady Grove*'s treatment of similar identifiers as personally identifiable information does not fill this gap for Plaintiffs' Complaint, which lacks the specificity, including the linkage to identified individuals seeking identified sensitive services, that *Shady Grove* found sufficient.

### 2. TIAA Did Not Perform the Requisite Interception or Disclosure Acts.

The Complaint's own allegations undermine its statutory claims. The Complaint alleges that the Analytics Trackers, Google Analytics and LinkedIn Insight Tag, "acquired," "captured," and "transmitted" user data. (Compl. ¶¶ 45, 56.) It does not allege that TIAA itself performed any affirmative act of interception or disclosure. "Permitting access" to a website by deploying third-party analytics code is not equivalent to the affirmative statutory acts of "intercepting," "disclosing," or "using" the contents of a communication as those terms are defined in the applicable state wiretap statutes. The statutes require volitional conduct directed at the content of communications; merely maintaining a website that incorporates third-party analytics tools, as virtually every commercial website does, does not satisfy that standard.

### 3. The Massachusetts Claim (Count IV) Is Foreclosed by *Vita*.

*Vita v. New England Baptist Hospital*, 243 N.E.3d 1185, 1189, 1198–99 (Mass. 2024), held that browsing and interacting with a website is not a "communication" under the Massachusetts Wiretap Act because the Act targets *secret electronic eavesdropping on person-to-person conversations*, not analytics tracking of user interactions with a webpage. The Opposition attempts to distinguish *Vita* by asserting that Oberst and Parziale's interactions constitute "bilateral electronic communications" transmitting specific confidential financial data intended for "TIAA only," analogizing the use of an online financial calculator to a telephone call with a personal financial advisor. Opp. at 14-15.

This analogy is a *legal conclusion*, not a factual allegation. Entering data into an automated web-based tool is a user-to-webpage interaction, not a person-to-person communication of the kind *Vita* held is protected. There is no human "recipient" on the other end of the "Am I On Track" or "Debt Illustrator" calculators; they are automated systems that process inputted data

algorithmically and return a result. This is precisely the type of human-to-machine interaction that *Vita* excluded from the Massachusetts Act's protection.

The Opposition's attempt to distinguish *In re Consumer Vehicle Driving Data Tracking Collection*, MDL Dkt. No. 3115 1:24-md-3115-TWT, 2026 WL 1092882 (N.D. Ga. Apr. 22, 2026), fails for the same reason. The Opposition argues that vehicle telemetry signals are not "personal" communications because they are sent by automated systems rather than personally by the user. But the same logic applies with equal force here: data submitted through automated web forms is processed by machine code, routed through automated systems, and never received by a human being at TIAA in real time. The no "second-party" recipient reasoning that the Opposition purports to cabin to vehicle telemetry applies equally to automated form-based data submission to a web calculator.

**4. The California Claim (Count II) Fails Because Google and LinkedIn Are Direct Parties to the Communications.**

TIAA's Motion demonstrated that Google and LinkedIn are direct parties to, rather than eavesdroppers on, the browser-to-server JavaScript transmissions that the Complaint challenges, relying on *In re Nickelodeon Consumer Privacy Litig.*, 827 F.3d 262, 276 (3d Cir. 2016), and *Cole v. Quest Diagnostics*, No. 2:23-cv-20647-WJM, 2025 WL 88703 (D.N.J. Jan. 14, 2025). The Opposition's response raises several arguments, none of which overcomes the insurmountable hurdle that dooms Count II: CIPA "is aimed only at 'eavesdropping, or the secret monitoring of conversations by third parties,'" *In re Google Inc. Cookie Placement Consumer Priv. Litig.*, 806 F.3d 125, 152 (3d Cir. 2015) ("*In re Google*"), and does not reach transmissions to which the website operator is a consenting party. Because TIAA was a party to the California Plaintiffs' browser communications and consented to the operation of Google Analytics and the LinkedIn Insight Tag on its website, CIPA's prohibition on third-party eavesdropping is not implicated. *See*

*Cole*, 2025 WL 88703, at *2–3 (dismissing CIPA claim because defendant website operator was "a party to the communication" and "plaintiffs' browsers directly communicate with the [alleged eavesdropper] about the webpages they are visiting, and as such, there is no need for the [eavesdropper] to acquire that information from transmissions to which they are not a party").

Moreover, Plaintiffs' CIPA theory necessarily sounds in derivative liability. Plaintiffs allege that TIAA "aids, agrees with, employs, or conspires with" Google and LinkedIn to violate § 631(a). (Compl. ¶ 154.) As TIAA's Motion explained, derivative liability under § 631(a) requires a predicate unlawful act by the third party—there must be a violation that TIAA aided or conspired to accomplish. *See In re Nickelodeon*, 827 F.3d at 276. If Google and LinkedIn are parties to the browser-to-server transmissions, they cannot violate § 631(a), because that provision targets only third-party eavesdroppers who are not parties to the communication. Without a predicate violation by Google or LinkedIn, Plaintiffs cannot state a derivative claim against TIAA for aiding or conspiring in a non-existent unlawful act. The Opposition does not address this derivative-liability defect, and its silence is fatal to Count II.

The Opposition's attempt to invoke Ninth Circuit authority to overcome these defects is unavailing. This Court is not bound by the Ninth Circuit, and the cases Plaintiffs cite are factually distinguishable**.**

*In re Facebook, Inc. Internet Tracking Litigation*, 956 F.3d 589 (9th Cir. 2020), is inapposite. That case involved Facebook tracking users across the entire internet, on third-party websites, after users had logged out of Facebook. *In re Facebook*, 956 F.3d at 596–97. The Ninth Circuit found that Facebook "gained a cradle-to-grave profile without users' consent." *Id.* at 599. Here, the alleged theory of interception is fundamentally different: Plaintiffs' own Complaint alleges that Analytics Trackers are JavaScript code that, when executed in the user's browser,

sends data directly to Google's and LinkedIn's servers. (Compl. ¶ 47.) That is a direct browser-to-third-party transmission initiated by code TIAA installed on its own website—not a surreptitious interception of a communication between two other parties on unrelated websites. The facts in *In re Facebook*, involving a social media company secretly tracking users on entirely unrelated third-party websites, bear no resemblance to the theories alleged here.

*Garcia v. Truist Financial Corp.*, 825 F. Supp. 3d 1149 (C.D. Cal. 2026), on which the Opposition relies heavily, is a single non-binding district court decision. *Garcia* did not analyze whether a predicate third-party violation is required for derivative liability. A single district court's refusal to dismiss at the pleading stage does not establish that the claim is viable as a matter of law, particularly where multiple other courts analyzing the identical question under § 631(a) have reached the opposite conclusion. *See In re Google*, 806 F.3d at 152; *Cole*, 2025 WL 88703, at *2–3.

*Karwowski v. Gen Digital, Inc.*, No. 24-7213, 2025 WL 3002610 (9th Cir. Oct. 27, 2025), is a non-precedential disposition. And *Mikulsky v. Bloomingdale's, LLC*, Nos. 24-3564, 24-3837, 2025 WL 1718225 (9th Cir. June 20, 2025), reversed a dismissal without addressing whether JavaScript-based analytics code executing in a user's browser and directly transmitting data to a third party's servers makes that third party a direct party to the communication. Neither case addresses, let alone resolves, the arguments TIAA raises here regarding Plaintiffs' pleading deficiencies.

The Opposition's remaining arguments fare no better. Plaintiffs contend that Google and LinkedIn do not receive "direct transmissions" but instead gain "access and opportunity" to intercept communications intended only for TIAA. (Opp. at 17.) This characterization contradicts the Complaint's own factual theory. The Complaint alleges that Analytics Trackers are "JavaScript

code" that, when executed, "send the intercepted information to the respective Unauthorized Third-Party owner of the Analytics Tracker." (Compl. ¶ 47.) JavaScript executes in the user's browser and sends data directly to Google's and LinkedIn's servers—that is, by definition, a direct browser-to-third-party transmission. The Opposition cannot simultaneously allege that the JavaScript code sends data directly to Google and LinkedIn while arguing that Google and LinkedIn are not direct recipients of those transmissions. Similarly, the Opposition's reliance on Google's and LinkedIn's terms-of-service warnings—which advise website operators not to share sensitive data—is a non sequitur. (Opp. at 17.) A third party's contractual disclaimers about how its tools should be used do not alter the technical architecture of how data is actually transmitted, nor do they determine who qualifies as a "party" to a communication under § 631(a).

For these reasons, Count II should be dismissed.

#### 5. The Maryland, Pennsylvania, and Florida Claims (Counts I, III, V) Still Fail to Plead Disclosure of Statutory "Contents."

The Opposition's treatment of the Maryland, Pennsylvania, and Florida claims relies heavily on a single footnote in *India Price v. Carnival Corp.*, 712 F. Supp. 3d 1347, 1355 n.4 (S.D. Cal. 2024), for the proposition that these state statutes are "largely analogous" to the Federal Wiretap Act and should be analyzed identically. But a single district court footnote cannot substitute for the statute-by-statute textual analysis that these distinct statutory schemes require. The Maryland Wiretapping and Electronic Surveillance Act, the Pennsylvania Wiretapping and Electronic Surveillance Control Act, and the Florida Security of Communications Act each have their own textual requirements, legislative histories, and bodies of interpretive authority. Plaintiffs' blanket "analogous statutes" theory invites this Court to collapse four distinct statutory frameworks into one and bypass the individual analysis each requires.

Moreover, even under the Opposition's unified framework, the substantive deficiencies in Plaintiffs' "contents" allegations, the failure to identify specific data values, specific plaintiffs, specific trackers, and specific occasions of interception, apply with equal force across all three state claims. As set forth above in Section II.B.1, listing abstract data categories is not equivalent to alleging the interception of actual communicative content.

**C. Plaintiffs' Timeliness and Tolling Arguments Do Not Salvage the Time-Barred Claims.**

Plaintiffs' tolling theory rests on an irreconcilable internal contradiction. Plaintiffs' Complaint itself quotes TIAA's Privacy Notice's general statement that TIAA will not disclose personal information unless certain conditions are met as the *basis* for its concealment and non-consent theories—asserting that TIAA promised confidentiality and then breached that promise. Yet the same Plaintiffs ask this Court to disregard that *same* Privacy Notice's express disclosures on the specific subject matter at issue in the Complaint: that TIAA deploys "pixels, beacons, and cookies" through service providers for "analytics, marketing, and interest-based advertising," with available opt-out mechanisms. That selective reliance is impermissible. Plaintiffs cannot selectively invoke cherry-picked language from the Privacy Notice to support their legal assertions (non-consent and concealment) while disavowing the portions that defeat them (disclosure of digital-tracking practices that placed Plaintiffs on inquiry notice by January 2023 at the latest).

The Opposition's attempt to avoid this result fares no better. Plaintiffs argue that the Privacy Notice is not properly before the Court at the 12(b)(6) stage. But the Complaint itself quotes and relies on the Privacy Notice. A document expressly quoted in and integral to the Complaint is incorporated by reference and may be considered on a motion to dismiss without converting the motion into one for summary judgment. *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 166 (4th Cir. 2016); *Keogh v. Meta Platforms, Inc.*, 680 F. Supp. 3d 601, 606 n.2 (D.S.C.

2023). The Complaint specifically cites and relies on the Privacy Notice and its authenticity is undisputed. The Court is well within its discretion to consider it. Moreover, even accepting Plaintiffs' characterization of *Javier v. Assurance IQ*, 649 F. Supp. 3d 891, 901–03 (N.D. Cal. 2023), as resting on the plaintiff's "admitted knowledge" rather than a categorical rule of judicial notice, the principle remains applicable here: Plaintiffs' Complaint reveals on its face that the Privacy Notice was publicly available and disclosed the tracking practices at issue. Conduct that is expressly disclosed in a publicly available privacy notice cannot plausibly be deemed concealed. Plaintiffs' concealment allegations are conclusory "upon information and belief" assertions—*e.g.*, that the Analytics Trackers were "purposefully designed to be undetectable by ordinary means" (Compl. ¶ 222)—unsupported by any specific factual allegations demonstrating affirmative concealment beyond the normal operation of standard analytics technology used by millions of websites.

The Privacy Notice's express disclosures of digital tracking via pixels, beacons, and cookies for analytics, marketing, and interest-based advertising placed every named Plaintiff on inquiry notice no later than January 2023, when the notice was in effect and all named Plaintiffs allege they were active TIAA customers. Compl. ¶¶ 7–16. Claims arising outside the applicable limitations periods should accordingly be dismissed or narrowed.

### D. Territorial and Choice-of-Law Defects Independently Require Dismissal or Narrowing.

The Opposition characterizes TIAA's territorial arguments as a "red herring." That characterization does not substitute for the required territorial pleading. Each state wiretap statute applies only to interceptions occurring within that state's territorial jurisdiction. Plaintiffs plead only their states of *residence*, not that the situs of interception (which may occur at TIAA's servers, at Google's or LinkedIn's data centers, or at points between) falls within the territorial reach of

each invoked statute. Residence and situs of interception are distinct concepts; the former does not establish the latter.

The Opposition cites no authority for the proposition that a plaintiff's residence alone satisfies a state wiretap statute's territorial requirement. Its citations to *Doe v. Microsoft*, No. C23-0718-JCC, 2023 WL 8780879 (W.D. Wash. Dec. 19, 2023), *Clancy v. The Bromley Tea Co.*, 308 F.R.D. 564, 572 (N.D. Cal. 2013), and *In re Google Inc.*, 2013 WL 5423918 (N.D. Cal. Sept. 26, 2013), address choice-of-law analysis at the *class certification* stage—not the threshold question of whether the Complaint adequately pleads that each statute's territorial nexus is satisfied. The Court need not wait until class certification to determine whether Plaintiffs have pled facts sufficient to invoke each state's law in the first instance.

**CONCLUSION**

For the foregoing reasons, Plaintiffs' Opposition fails to overcome the grounds for dismissal set forth in TIAA's Motion. Defendant TIAA respectfully requests that the Court grant the Motion to Dismiss and dismiss the Complaint with prejudice. In the alternative, TIAA requests that the Court narrow any surviving claims as set forth in the Motion.

Dated: July 31, 2026

Respectfully submitted,

HOLLAND & KNIGHT LLP

/s/ Jessica L. Farmer
Jessica L. Farmer (Bar No. 18978)
Sara J. Benson (Bar No. 30425)
800 17th Street N.W., Suite 1100
Washington, D.C. 20006
Telephone: (202) 955-3000

*Counsel for Defendant Teachers Insurance and Annuity Association of America*

**CERTIFICATE OF SERVICE**

I hereby certify that on July 31, 2026, a true and correct copy of the foregoing was served via the Court's CM/ECF system on all counsel of record in this case.

*/s/ Sara J. Benson*__________
Sara J. Benson